**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MERIT INDUSTRIES, INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 03-1618** |
| | : | |
| **JVL CORPORATION** | : | |

**MEMORANDUM OPINION**

Savage, J.                                                                          **August 24, 2007**

In this patent infringement action, Merit Industries Inc. ("Merit") alleges that JVL

Corporation ("JVL"), its chief competitor in the video game manufacturing industry, infringed

three of its patents relating to coin-operated video game machines.  The parties dispute the

meaning of several significant terms in the patent claims.  Therefore,  pursuant to *Markman*

*v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370

(1996), the claims at issue must be construed.

**Claim Construction**[1]

Claim construction is a matter for judicial determination.  *Markman*, 517 U.S. at 372.

The analysis begins and remains focused on the language of the claims themselves

because that is what the inventor used to distinctly describe his invention.  *Interactive Gift*

---

[1] Patent infringement analysis proceeds in two steps: first, the meaning of the claim language is
construed, and second, the accused product or process is viewed in light of the construed claims.  The patent
claims, which delineate the metes and bounds of the exclusive rights the patent applicant is claiming, are
found in the patent specification.  The specification is one element of a patent application. 37 C.F.R. § 1.77(a).

In addition to the claims, the specification includes a title, cross references to related applications, a
statement regarding government rights, background on the field of the invention, and the related art, a
summary of the invention, a brief description of the drawings included in the application and a detailed
description of the invention. 37 C.F.R. § 1.77(b).

*Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (*citing* 35 U.S.C. § 112, ¶ 2)

Claim language is generally given its "ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Patents are "addressed to and intended to be read by" those skilled in the field of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006) (citations omitted). Thus, a term's "ordinary and customary meaning" is the significance it would have to a "person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313 (*citing Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

Because such meaning often is not readily apparent, courts consult sources that shed light on how a person of ordinary skill in the art would understand the claim language. *Phillips*, 415 F.3d at 1314. In the claim construction process, the words of the claims themselves, the rest of the specification and the prosecution history are considered intrinsic evidence of primary importance. *Id.* In addition, a court may consult "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* However, because the universe of extrinsic evidence is boundless and such evidence is not created at the time of the patent or for the purpose of explaining the patent's scope, it is considered less reliable than intrinsic evidence. *Id.* at 1318-19. Therefore, courts should resort to extrinsic evidence only when intrinsic evidence is insufficient to resolve claim interpretation disputes.

Claim terms should be construed to preserve their validity. *Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999) (citations omitted). The context

in which a term is used in the claim can be "highly instructive." *Phillips*, 415 F.3d at 1314. The words surrounding a disputed term may help suggest whether a proposed construction is redundant or incorrect. Additionally, the use of a term in other claims of the patent is informative because terms are normally used consistently throughout the patent. *Id.*

The Federal Circuit has emphasized the importance of the specification in claim construction. *See id.* at 1315. "[C]laims must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979 (citations omitted). The specification's written description of the invention "must be clear and complete enough to enable those of ordinary skill in the art to make and use it." *Vitronics*, 90 F.3d at 1582. Indeed, the specification is the "'single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (*quoting Vitronics*, 90 F.3d at 1582).

In claim construction, only the language in dispute need be construed. *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1311 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1157 (2006).

## The '717 Patent

United States Patent No. 5,575,717 "relates generally to a system for creating menu choices of video games on a display from a group of video game menu options shown on the video display." U.S. Patent No. 5,575,717 (filed Nov. 19, 1996) at 1:1-11 ("'*717 patent*").

As described in the '717 patent, a variety of video games may be played on a video game machine. The invention allows a video game machine operator to select particular

games from among all games in the machine that may be played.  This selection is made while the machine is in the "programming mode."

The invention also describes "a method for tallying a total currency amount fed into a gaming machine" which accepts different types of coins, and a method for "adjusting the coin/credit ratio" in such a machine.  *'717 patent* at 2:38-40; 2:51-52.  In other words, it allows the operator to fix the price of a game and calculates the amount the players put into the machine.

The '717 patent includes twenty-one claims.  *'717 patent* at 7-10.  Plaintiff and defendant dispute the meaning of seven terms appearing throughout the twenty-one claims.

### Claim 1

The parties dispute the proper construction of four separate terms found in claim 1 of the '717 patent.[2]  The disputed terms are "video game menu options," "video game menu choices," "programming mode," and "displaying ... options and ... choices."  Claim 1, with the disputed claim terms highlighted, reads as follows:

> (1)    An apparatus for providing menu choices of video games on a display, the apparatus comprising:
>
> (a)    a mode selector for setting the apparatus in one of either a **programming mode** for selecting **video game menu options** or a menu choice selection mode for selecting **video game menu choices** for game activation;
> (b)    a video display for **displaying** and selecting the **video game menu options** and **video game menu choices**, **the video game menu options** being available for selection as **video game menu choices**; and
> (c)    a display controller for simultaneously **displaying video game menu options** and **video game menu choices** on the video display when the

---

[2] These four terms also appear in other claims of the '717 patent. Their meaning is consistent throughout the patent.  *Phillips*, 415 F.3d at 1314.

> mode selector is in the **programming mode**, and for displaying **video game menu choices** when the mode selector is in the menu choice selection mode.

Clauses (a), (b) and (c) make up the body of claim 1 and are referred to as claim limitations. *Dawn Equipment Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1015 n.1 (Fed. Cir. 1998). "Comprising," the transitional phrase that connects the preamble of the claim with the body, creates a presumption that the claim limitations that follow are only a part of the device and do not exclude additional, unrecited elements. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).

"*video game menu options*"

Merit's posited construction of "video game menu options" is "all of the selectable game menu items." *Plaintiff Merit Industries, Inc.'s Supplemental Markman Brief* at 9 ("*Pl.'s Suppl. Br.*"). JVL's suggested construction is "all of the video games that can be selected to be made available for a user to play on a video game machine." *JVL's Markman Hrg. Presentation*, '*717 patent* at 13 ("*Def.'s '717 Presentation*").

The parties appear to agree that "video game menu options" are selectable video games and that the word "options" includes "all" of the selectable games. *See Merit's Markman Hrg. Presentation*, '*717 patent*, Ex. 3 at 1 ("*Pl.'s '717 Presentation*") ("video game menu options are 'selectable games'"). They disagree on the additional detail needed to properly construe this term. Specifically, Merit does not ascribe to JVL's inclusion of "to be made available for a user to play on a video game machine." JVL recognizes that "video game menu options" presented in the programming mode can become "video game menu

choices" available for a user to play.  Merit construes "video game menu options" as selectable video games but does not explain for what they can be selected.

Merit does not offer any basis for its use of the word "items" in its proposed construction.  There is no reason to refer to the options as anything other than games.

The term "video game menu options" is construed as "*video games that can be selected in the programming mode to be video game menu choices playable in the menu choice selection mode*."

"*video game menu choices*"

JVL's proposed construction of "video game menu choices" is "the subset of video game menu options that are currently available for a user to play on a video game machine." *Def.'s Presentation, '717 patent* at 16.  Merit offers a more succinct construction - "chosen game menu items."

The "video game menu choices" are the games selected by the operator that players may play.  The claim language itself repeatedly refers to "selecting" video game menu options and video game menu choices.  *'717 patent,* claim 1.  Yet, Merit's proposed construction employs "chosen" instead of "selected."  Here, the meaning of "selecting," a term found in the claim language surrounding the disputed term, is unambiguous. Therefore, Merit's use of "chosen" instead of "selected" is not adopted.

Merit challenges JVL's inclusion of "currently available for a user to play on a video game machine."  At the *Markman* hearing, JVL argued the specification supports inclusion of this language, pointing to the description of Figure 2, one of the preferred embodiments of the invention, which states "[i]n the menu choice selection mode, the programmed menu

6

*choices are selectable for game activation* either by touching the location of the desired game ...” *'717 patent* at 4:29-31 (emphasis added).

The portion of the specification upon which JVL relies does not justify its construction. The description, by its express terms, is limited to the "menu choice selection mode." It does not encompass the other mode, the programming mode. Indeed, the patent does not contemplate game play by players when the apparatus is in the programming mode. In other words, in the programming mode, the video game menu choices are not "currently available for a user to play."

The claim language is clear that a video game menu option can be selected to be a video game menu choice. *'717 patent*, claim 3. Merit's construction, "chosen game menu items," does not explain from where the games are chosen. Video game menu options are selected to be video game menu choices by the game operator while the apparatus is in the programming mode. *See '717 patent*, claim 1. When the machine is in the menu choice selection mode, a player can select a "video game menu choice," a particular game, to play. Therefore, "video game menu choices" is construed as "*video games, selected from among the video game menu options, made available for play in the menu choice selection mode*."

"*programming mode*"

The invention has two modes: a "programming mode" and a "menu choice selection mode." *'717 patent*, 2:23-25. A mode selector allows the operator to choose between the two modes. *'717 patent*, claim 1. The parties dispute the meaning of the term "programming mode" as used repeatedly in claim 1 and throughout the '717 patent claims.

7

Merit construes this phrase as "a mode in which selectable game menu items are chosen." *Pl.'s Suppl. Br.* at 11.   Once again, JVL proposes a lengthier construction, suggesting that "programming mode" is "a mode in which video game menu options, which appear on a display, are selected to be video game menu choices, which appear simultaneously on the same display as the video game menu options." *Def.'s Presentation, '717 patent* at 19.

The primary dispute is whether the video game menu options and video game menu choices must be displayed simultaneously.   According to JVL, the intrinsic evidence demonstrates that they must.  The specification distinguishes the "*simultaneous* display of video game menu options and video game menu choices on the video screen when the mode selector is in the programming mode," from the display of only "video game menu choices when the mode selector is in the menu choice selection mode."  *'717 patent* at 2:28-31.  The brief description of Figure 2 contained in the '717 patent explains that menu options are selected by the operator in the programming mode.  *'717 patent* at 4:8-9.

The prosecution history also lends support for JVL's interpretation.   During reexamination, Merit distinguished the '717 patent from a piece of prior art called the Super Duper Casino. At the time, Merit argued the Super Duper Casino's manual "does not suggest that a display controller <u>simultaneously</u> displays "video game menu options" <u>and</u> "video game menu choices" on a video display <u>when a mode selector is in a programming mode.</u>" *JVL's Supplemental Claim Construction* Brief, Ex. E at 15 (*"Def.'s Suppl. Br."*) (emphasis in original).  Merit's invention does.

Though the display controller does cause "a simultaneous display of video game menu options and video game menu choices on the video screen when the mode selector

is in the programming mode," this is not sufficient reason to construe "programming mode" as JVL suggests. The language that JVL relies on describes what a display controller does. It is not meant to describe the meaning of "programming mode." Nothing in limitation (a) of claim 1, which describes what the programming mode does, indicates that the display of options and choices must be simultaneous. Similarly, claim 13 which describes selecting video game menu options in the programming mode does not describe video game menu options and video game menu choices as being displayed simultaneously. Indeed, the specification explains that in one embodiment of the programming mode, selected menu options are deleted from the first region of the display when placed in the designated video game menu choice location. *'717 patent* at 2:19-28. Thus, the video game menu options and choices are not always displayed simultaneously.

"Programming mode" is construed as "*a mode in which video game menu options are selected to be video game menu choices*."

"*displaying ... options and ... choices*"

JVL contends "displaying ... options and ... choices" means "simultaneously displaying both all video game menu options and separately displaying all video game menu choices when the video game menu options are available for selection." *Def.'s '717 Presentation* at 23. The principal disagreement is whether, as JVL argues, the options and choices must be "simultaneously" displayed.

JVL's reliance on the claim language to support its construction is misplaced. Indeed, the differences in the language in elements (b) and (c) contradict JVL's position. The term "displaying ... options and ... choices" is in element (b) of claim 1, describing a video display. The language also appears in element (c), describing a display controller.

Claim limitation (b) of claim 1 reads "A video display for *displaying* and selecting the video game menu *options and choices*, the video game menu options being available for selection as video game menu choices." Nothing in the cited language suggests the "options" and "choices" must be displayed simultaneously.

Claim 1(c) states "a display controller for *simultaneously displaying* video game menu *options* and video game menu *choices* on the video display when the mode selector is in the programming mode, and for displaying video game menu choices when the mode selector is in the menu choice selection mode." The patentee's specific use of the word "simultaneously" in limitation (c) to indicate that the options and choices are displayed at the same time when in the programming mode undermines JVL's argument that "displaying ... options and ... choices" must always be read to be done simultaneously. *See Phillips*, 415 F.3d at 1314. Claim terms are presumed to be used consistently throughout the patent claims. *Research Plastics, Inc. v. Fed. Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005). The insertion of "simultaneously" into JVL's construction would render 1(c) redundant and infuse 1(b) with unfounded meaning.

The prosecution history does not support JVL's construction. As discussed above, Merit distinguished its invention from the Super Duper Casino prior art by noting that claim 1 of the '717 patent "discloses simultaneously listing all of the selectable games as options ... and separately listing all of the games which are choices." *Def.'s Suppl. Br.*, Ex. E at 15. Like JVL's construction, this statement describes "simultaneously" listing "all" options and choices, but it was not made to limit the invention to that capability. Rather, it was made to distinguish the '717 system from the programming setup of the Super Duper Casino prior art which provides a single list of all games and allows for each game to be

switched "on" or "off." It does not include a separate list of "video game menu choices" in the programming mode. *Id.*

In certain instances "displaying ... options and ... choices" may mean, as JVL posits, the simultaneous and separate display of those options and choices.   But, in those instances, such meaning is clear from the surrounding claim language.   There is no basis for imposing JVL's suggested meaning on this term throughout the claims regardless of the context in which it appears.   The term "displaying ... options and ... choices" as used in the '717 patent does not have a technical meaning that must be deciphered.   The constructions for "video game menu options" and "video game menu choices" have already been discussed and the term "displaying" is unambiguous.   Its plain and ordinary meaning is clear.   Thus, construction of this language is unnecessary.

### Claim 2

The terms "a first region" and "a second region" appear in claim 2 of the '717 patent:

> (2) An apparatus according to claim 1 wherein the video display includes **a first region** for displaying the video game menu options and **a second region** for displaying the video game menu choices.

Because it refers back to claim 1, claim 2 is considered "dependent" on claim 1.  In addition to its own limitations, its also includes all of the limitations of claim 1.  35 U.S.C. § 112, ¶ 4.   Accordingly, the "video display" of claim 2 is the same "video display" claimed in limitation (b) of claim 1.

#### *"a first region" and "a second region"*

Again relying on Figure 2 of the '717 patent and the constructions it propounded for claim 1, JVL argues that "a first region" and "a second region" are "separate and distinct

areas.   The first region displays all video game menu choices and the second region simultaneously and separately displays all video game menu options."   *Def.'s '717 Presentation* at 35.   Merit proffers an alternative construction of claim 2: "The apparatus of claim 1, wherein: The video screen includes a first area for showing images relating to all of the selectable game menu items.  And a second area for showing images relating to the chosen game menu items."  *Pl.'s '717 Presentation*, Ex. 3 at 4.

The primary dispute concerns JVL's use of the additional words "separate and distinct" and "simultaneously and separately."  Merit argues nothing in the specification or prosecution history supports the insertion of these words.   It specifically takes issue with JVL's reliance on the '717 patent's description of the preferred embodiment.  JVL argues that the "detailed description of preferred embodiments" teaches that Figure 2 is a game menu screen "divided into first, second and third regions."   *'717 patent* at 3:48-50.  This justification for the "separate and distinct" construction is improper because  Figure 2 is a preferred embodiment of the '717 patent that should not limit construction of the claims. *Phillips*, 415 F.3d at 1323. ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (cautioning against limiting claimed invention to preferred or specific embodiments or examples).  More importantly, the specification expressly notes that the invention is "not limited" to preferred embodiments depicted in the drawings.  '717 *patent* at 2:65 - 3:2.

Nonetheless, there can be no doubt that "a first" and "a second" region are distinct regions.  Anyone, including one of ordinary skill in the art, would understand these terms

to refer to two different regions. The specification advises "[t]he present invention is an apparatus for providing menu choices of video games on a video screen having first and second regions." *'717 patent* at 2:20-22.   As JVL points out, Merit stated during the reexamination that "menu options from a region are placed into specific locations in *another* region" when addressing the construction of claim 8,[3] which also includes the terms "a first region" and "a second region." *Def.'s Suppl. Br.*, Ex. E at 8 (emphasis added).

Relying on the fact that claim 2 depends on claim 1, JVL argues that the first and second regions "simultaneously and separately" display options and choices.  The basis for JVL's current interpretation is its earlier construction of "displaying ... options and .. choices" as requiring simultaneous and separate display.  Because that construction was rejected, it does not support JVL's current construction of "a first region" and "a second region."

There is no clearer way to interpret "a first region" and "a second region" than the language of the claim itself.  The clear and unambiguous meaning is that they are two different regions.  No further construction is necessary.

### Claim 13

The parties disagree on the construction of two terms, "menu choice selection display" and "placing," both of which appear in independent claim 13:

(13)    A method for providing video game menu choices on a video display from a

---

[3]  Claim 8 reads as follows:
(8)      An apparatus for programming video game menu choices on a display from a group of video game menu options, the apparatus comprising:
  (a) a video screen having
       (i) a first region for displaying video game menu choices;
       (ii) a second region for displaying video game menu options, the video game menu choices and video game menu options being simultaneously displayed; and
   (b) a display controller for causing video game menu options selected from the second region to be displayed in the first region as a video game menu choice.

group of video game menu options, the video display including a programming mode for selecting video game menu options, a menu choice selection mode for selecting video game menu choices for game activation, and a **menu choice selection display**, the method comprising the steps of:

(a)   setting the apparatus to the programming mode;
(b)   displaying the video game menu options on the video display;
(c)   selecting a video game menu option from the video display;
(d)   **placing** the video game menu option in the **menu choice selection display**;
(e)   repeating steps (c) and (d) until a desired number of video game menu options are selected; and
(f)   exiting the programming mode and entering the menu choice selection mode wherein one of the video game menu choices may be selected for activation from the video game **menu choice selection display**.

*"menu choice selection display"*

JVL construes "menu choice selection display" as "a list of video game menu choices that is displayed simultaneously with the separate list of video game menu options in the programming mode."  Merit's construction is a "display of the chosen game menu items."  *Pl.'s Suppl. Markman Br.* at 23.  As discussed above, "chosen game menu items" is Merit's proffered construction of "video game menu choices."  Thus, plaintiff and defendant agree that "menu choice selection display" involves video game menu choices.

As with the interpretation of many other terms in this patent, Merit challenges JVL's inclusion of language concerning the when and where of the display's appearance.  The issue is whether the words "that is displayed simultaneously with the separate list of video game menu options in the programming mode," as JVL proposes, are necessary.

Beginning with the language of the claim itself, claim 13(f) counsels against a construction that includes "in the programming mode."  Claim 13(f) recites "exiting the programming mode and entering the menu choice selection mode wherein one of the video game menu choices may be selected for activation from the video game menu choice

selection display." Claim 13(f) specifically indicates that selections may be made from the menu choice selection display upon "exiting the programming mode and entering the menu choice selection mode." *'717 patent*, claim 13(f). When the claim language explicitly describes "menu choice selection display" in the menu choice selection mode, its proper construction cannot limit it to the programming mode.

JVL's reliance on a description of the preferred embodiment does not dictate a different result. JVL cites the description of the preferred embodiment in Figure 2 which states "[i]n the programming mode, menu options 36-62 are selected by the operator from the second region 20 and placed in locations 64-78 in the third region 22 as designated by the operator." *'717 patent* at 4:8-11. This limitation should not be read into the construction because a claim is not limited to its preferred embodiments. *Philips*, 415 F.3d at 1323. Therefore, JVL's inclusion of "in the programming mode" in its construction is not adopted.

Nor should "menu choice selection display" be construed to mean, as JVL suggests, that the video game menu choices are "displayed simultaneously with the separate list of video game menu options." The language in the specification describing that video game menu options and choices are displayed simultaneously when the mode selector is in the programming mode does not lead to the conclusion that "menu choice selection display" always requires separate and simultaneous display of options and choices. *'717 patent* at 2:28-31. Having rejected the limitations JVL seeks to introduce, "menu choice selection display" is construed as "*a display of video game menu choices selected from the video game menu options*."

"*placing*"

The parties agree on the plain meaning of the word "placing," but JVL takes issue

with what it sees as Merit's collapse of the terms "options" and "choices" into the single term "item". JVL's proposed construction of "placing" is "putting the selectable game menu option into a particular desired location in the display of the chosen game menu choice." *Def.'s '717 Presentation* at 31.  Merit's is "putting the selectable game menu options item into a particular desired location in the display of the chosen game menu choice item." Thus, the constructions are identical, except Merit inserts "item" after "options" and "choice".

There is no question that "game menu options" and "game menu choices" are different things.  It does not appear that Merit presumes otherwise.  However, Merit does not offer adequate justification for inclusion of "item" in its construction, stating simply that "[w]hat is displayed or shown on the video screen are symbols, or items, representing the actual video games."  *Pl.'s Opening Markman Br.* at 18.  There is no rationale offered for equating "symbols" and "items."  Nor has Merit offered any explanation, based on the specification or otherwise, of why the word "item" is necessary.  It is understood that the symbols or icons displayed on the screen represent video games.  "Item" does not clarify this point.  Thus, it is not imported into the meaning of the term.  No construction of "placing" is required.

## The '887 Patent

United States Patent Number 6,082,887 relates to a video game machine with a "tournament mode" which allows for conducting automated tournaments. U.S. Patent No. 6,082,887 (filed June 18, 1998) ("*'887 patent*")   In the tournament mode, a number of games can be played by multiple players.  The invention allows the operator to set up multiple tournaments, designating the dates, duration of the tournament  and sequence in

which the tournament games will be played.  Each tournament game generates a total player score which allows tournament winners to be identified.

Merit and JVL dispute the construction of five terms in this patent.  In addition, JVL argues that three terms cannot be construed.

## Claims 1 and 6

The first three terms in dispute, "tournament game", "sequence of tournament games" and "tournament period" are found in independent claims one and six of the '887 patent.[4] The disputed terms are highlighted:

(1)    An automated tournament system for use with a game machine, the game machine implementing the system when placed in a tournament mode, the system comprising:

(a)    a plurality of **tournament games** playable by a plurality of players on the game machine, each of the plurality of **tournament games** generating a total player score upon completion of game play, the player scores being used to determine the tournament winners;

(b)    means for preprogramming at least one **sequence of tournament games** from the plurality of **tournament games**; and

(c)    means for programming a **tournament period** for each **tournament game**, the preprogrammed **tournament game** for each sequence being playable during the programmed **tournament period** for the respective sequence.

(6)    A method of conducting automated tournaments in a game machine, the game machine implementing the tournaments when placed in a tournament mode, the game machine including a plurality of **tournament games** playable by a plurality of players on the game machine, each of the plurality of **tournament games** generating a total player score upon completion of game play, the player scores being used to determine the tournament winners, the method comprising:

(a)    preprogramming at least one **sequence of tournament games** from the plurality of **tournament games**; and

(b)    programming a **tournament period** for each **tournament game**, the preprogrammed **tournament game** for each sequence being playable during the programmed **tournament period** for the respective sequence.

---

[4] Use of these terms is not limited to claims one and six. However, JVL focused on these particular claims during the *Markman* hearing.

"*tournament game*"

The game machine described in the '887 patent allows each video game "to be played in either a regular (non-tournament) mode, or in a tournament mode." *'887 patent* at 3:8-9.  According to JVL, the patentee acted as lexicographer by defining a "tournament game" as "an extended version of a standard game" that "must have more rounds than a standard game." *JVL's Markman Hrg. Presentation*, *'887 patent* at 8 ("*Def.'s '887 Presentation*").  Merit does not offer a specific construction for "tournament game," but it disclaims acting as a lexicographer and argues neither of JVL's limitations should be read into the construction.

A patentee acting as its own lexicographer can create a new word, assign a meaning to a word without regard to the ordinary and customary meaning of the word, or modify a word's ordinary meaning. *Vitronics*, 90 F.3d at 1582.  Although lexicography does not require a rigid statement of definition, its assigned meaning must appear with reasonable clarity and precision in the patent.  *Astrazeneca AB*, *v. Mutual Pharm. Co., Inc.*, 384 F.3d 1333, 1339-40 (Fed. Cir. 2004).  The specification sheds light on whether the inventor has chosen to act as his own lexicographer and used terms in a manner "inconsistent with their ordinary meaning," that is, ascribing the inventor's own meaning to the term.  *Vitronics*, 90 F.3d at 1582.

The specification states that "a tournament game consists of an extended version of the standard game." *'887 patent* at 9:15-16.  In construing "tournament game," the critical issue is whether this statement applies to the patent without qualification or whether it describes only a specific embodiment of the invention.   JVL argues this statement is not exemplary, but unambiguously applies to the invention as a whole.   Merit disagrees,

insisting this language merely describes the preferred embodiment of Figure 10.

To resolve this dispute, it is necessary to consider the context of the statement. The language at issue appears in the section of the patent entitled "Detailed Description of Automated Tournament System."   This section includes descriptions of the drawings included in the patent.  It states "if the Tournament Setup button" of Figure 9, "is pressed on the initial setup display screen, the Tournament Setup display screen of Figure 10 appears."  *'887 patent* at 7:54-56.  Figure 10 is a "Tournament Setup display screen" for a preferred embodiment of the invention.  *See '887 patent* at 2:27-29, 2:48-49.  This "Tournament Setup display screen allows access" to a number of functions depicted in Figure 10.  *See '887 patent* at 7:57-58; *'887 patent*, Fig. 10.  Following the functions listing, is "an example of recommended prices for the Credit Fields of the tournament games shown in Figure 10," which depicts, among other things, three rounds of a Solitaire tournament game being offered for eight credits.  *Id.* at 8:65 - 9:11.  Following is the terminology at issue:

> As noted above, a tournament game is played in the same manner as a standard (non-tournament) game.  *However, a tournament game consists of an extended version of the standard game*.  For example, the standard Solitaire game may have only one round and may cost one credits [sic], while the tournament game offers three rounds for eight credits.
>
> *'887 patent* at 9:13-18. (emphasis added)

To refute JVL's argument that the italicized language provides an unqualified definition of "tournament game," Merit insists Figure 10 is simply an "example" relating to "recommended default prices for the Credit Fields," not a definition of tournament games. The issue is not what Figure 10 depicts.  It is whether the sentence refers only to Figure 10 or to the patent generally.

Although the context does not clearly indicate an intention to limit application of the "extended version of a standard game" language to Figure 10, the record does not show that Merit acted as its own lexicographer. Merit was free to assign "tournament game" a meaning other than its ordinary one.  In order to do so, it had to "deliberately and clearly point out how [this term differs] from the conventional understanding."  *Apple Computer, Inc. v. Articulate Systems, Inc.*, 234 F.3d 14, 21 n.5 (Fed. Cir. 2000) (citation omitted).  The patentee's lexicography must, therefore, appear 'with reasonable clarity, deliberateness, and precision' before it can affect the claim."  *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1249 (Fed. Cir. 1998) (*quoting In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)).

Merit did not assign any unconventional meaning to "tournament game."  JVL cites a single sentence in the entire patent application/specification to support its argument. There is nothing in that sentence and the context in which it appears to support a "clear" or "deliberate" intention to redefine the term.  Therefore, the first part of JVL's proposed construction, "an extended version of a standard game," is not adopted.

JVL also construes a "tournament game" as having "more rounds than a standard game."  *Def.'s* '887 *Presentation* at 8.  As noted above, the specification states "the standard Solitaire game may have only one round and may cost one credit [sic], while the tournament game offers three rounds for eight credits."  *'887 patent* at 9:16-18.  This language describes recommended tournament game prices for the Tournament Setup display screen example of Figure 10 which relates to the preferred embodiment of a tournament system found in Figure 1.  *See id.* at 2:48-49; 7:19-20.   It describes what may, not what must, occur.  *Id.* In other words, it is a possibility that does not limit a "tournament

game" to always having more rounds than a standard game. *Philips*, 415 F.3d at 1323. Nor, contrary to JVL's suggestion, can a blanket limitation be found in the example of default prices for the Credit Field of the tournament games shown in Figure 10.  The patent states that the default prices are merely an example applicable to Figure 10.  *'887 patent* at 8:65-9:12.  Accordingly, the second aspect of JVL's construction of "tournament game" is not adopted.

"Tournament game" as used in the '887 patent is simply "a game playable in the tournament mode."  As the specification describes, "[i]n the tournament mode, a plurality of tournament games are playable by a plurality of players ..." *'887 patent* at 2:1-2.  The "detailed description of the invention" distinguishes when a player plays what JVL might call a "standard" game from a tournament game: "[t]he video game machine may allow for each of the video games to be played in either a regular (non-tournament) mode, or in a tournament mode."  *Id.* at 3:7-9. The specification's "overview of automated tournament system" prescribes certain necessary functions:

> 1.    A selected number of pre-loaded video games are designated
>        as games which can be played in the tournament mode;
> 2.    A portion of each tournament game price is programmed to be
>        allocated to the prize pool.  An initial seed amount may also be
>        set;

*Id.* at 3:21-27.  This juxtaposition suggests that a "tournament game" is one of the pre-loaded games described in the first clause.  Accordingly, "tournament game" is construed as "*a game playable in the tournament mode.*"

"*sequence of tournament games*"

 "Sequence of tournament games" first appears in claim 1(b), a means-plus-function claim.  Pursuant to 35 U.S.C. § 112, a means-plus-function claim expresses a "means or

step for performing a specified function" without identifying the equipment used to perform the function.  To construe a means-plus-function claim, it is necessary to first identify the claimed function, and then, determine what, if any, structure named in the specification performs the disclosed function.  *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1257-58 (Fed. Cir. 1999).

Merit contends that the function disclosed in claim 1(b) is "programming in advance at least one sequence of tournament games from the more than one tournament game."[5] *Merit's Claim Construction Presentation '887 patent*, Ex. 4 at 14 ("*Pl.'s '887 Presentation*"). JVL defines "sequence of tournament games" as "two or more successive tournament games.  A series of standard games played as rounds in a single tournament is not a sequence of tournament games." *Def.'s* '887 *Presentation* at 11.

JVL advances a number of arguments in support of its construction.  First, the plain and ordinary meaning precludes a sequence of games from including any less than two games.   While acknowledging that dictionaries are extrinsic evidence that are not determinative of claim construction, it points out that in the initial, pre-reexamination *Markman* briefing in this case, both parties offered dictionary definitions of "sequence" as meaning "following of one thing after another; succession." *JVL's Opening Markman Br.* at 62; *Merit's Opening Markman Br.* at 90.

In this instance, the dictionary definition is valuable to "understanding the commonly understood meaning" of "sequence."  *Phillips*, 415 F.3d at 1322-23.  ("[J]udges are free to consult dictionaries ... and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or

---

[5] The structure disclosed by Merit is a "processor having an input device."  *Pl.'s Claim Construction Presentation '887 patent*, Ex. 4 at 14.

ascertained by a reading of the patent documents.") (citations omitted).  The "following of one thing after another" undoubtedly references more than one thing.  Notwithstanding this commonly understood meaning of "sequence," Merit argues that playing a game once is enough to constitute a sequence. *Tr.* At 118-19. Given that the claim language itself refers to a sequence of "tournament games," not a sequence of "a tournament game," JVL insists it would be nonsensical to construe a "sequence of tournament games" to be one game.

Resolution of this dispute hinges on the significance afforded certain drawings included in the patent.  Figures 11(a) through 11(d) are "four examples of programmable tournament sequences."  *'887 patent* at 7:20-21.   The depictions of each of the four sequences includes five spaces, labeled from left to right, "current," "next," "next + 1," "next + 2," "next +3."  Within each space is either the name of one of five video games or a repeat or end symbol.  As the patent describes, "[i]n the example shown in the figures, a series of five consecutive tournaments can be set at one time and may be set to repeat in sequence.  Any or all of the five tournament games may be used in sequence."  *'887 patent* at 9:21-25.



Merit points to Figure 11(c), in which Solitaire is listed in the "current" space, and the end symbol appears in the space labeled "next."  Three different game names appear in the spaces labeled "next + 1," "next +2" and "next +3."  Figure 11(c) states, "The Sequence will run SOLITAIRE and then END."

Relying on Figure 11(c), Merit insists that playing a game once constitutes a sequence. *Tr.* At 118-19.  In further support of its position, it notes that in describing the Figure 11 examples, the specification states "[i]f the video game 12 is dedicated to playing only a single game, the tournament sequence will be set to either continuously run the tournament using a single game or to run the tournament for only a discrete number of times." *Id.* at 9:25-29. This language allows for the possibility that a tournament sequence might include only one type of game, such as Solitaire or Royal Flash.  However, it does not demonstrate that a "sequence" can be comprised only of a single play of one type of game.  It would be inconsistent with the meaning of "sequence" to define it as including anything less than two.

This is not an instance in which Merit acted as its own lexicographer to give "sequence" a definition different from its commonly understood meaning.  To do so, it would have had to "clearly express that intent in the written description." *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.,* 395 F.3d 1364, 1370 (Fed. Cir. 2005).  Yet, Figure 11(c) is what Merit relies on to support its redefinition of "sequence."  This depiction, which is subject to varying interpretations, does not evidence the patentee's intent to impart a novel meaning to the word "sequence." *See Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.,* 214 F.3d 1302, 1307 (Fed. Cir. 2000).

As explained above, a "tournament game" is a game playable in the tournament mode.  Merit's arguments to the contrary, "sequence" retains its plain and ordinary meaning.  Here, "sequence of tournament games" refers to *"one or more types of tournament games played at least two times in succession*."  A single play of a single tournament game is not a "sequence."

"*tournament period for each tournament game*"

The next disputed term, "tournament period for each tournament game" is part of the means-plus-function limitation of Claim 1(c) ("means for programming a tournament period for each tournament game, . . .").  JVL defines a "tournament period for each tournament game" as "a block of time during which each tournament game in a sequence can be played, which is defined before the sequence begins."  *Def.'s* '887 *Presentation* at 18. Merit defines the function in this means-plus-function limitation as "programming a tournament duration for each tournament game in the sequence of tournament games." *Pl.'s '887 Presentation,* Ex. 2 at 2.

The specification clearly states that each tournament game has a programmed tournament duration. *'887 patent* at 2:7-8 (" ... a tournament period is programmed for each tournament game.") Thus, this aspect of both constructions is correct.

JVL and Merit disagree as to when the length of the tournament period is programmed.  JVL contends the tournament period is defined during setup, before the sequence begins.  It relies primarily on the following specification language:

> *During the setup mode, the tournament duration for each tournament game is set and stored in the tournament duration selector/memory* **22.**  Specifically, start and stop dates and times are selected.  The tournament duration may be as short as a few hours, or may be very long, such as a month.  The processor **14** is programmed to allocate a percentage of the coin drop **20** to a prize pool **24** during the duration of the tournament.  *Once all of the setup parameters are entered, the video game machine **12** is placed in a game play mode or normal operating mode.*

*'887 patent* at 4:57-66 (emphasis added).  The cited language describes that the

tournament period is fixed during the setup mode, not when the machine is in the tournament mode.  In other words, the time limitations are set before the tournament games are played.

Merit equates JVL's "before the sequence begins" language with "preprogramming" and notes that the patent specifies "programming" as opposed to "preprogramming" with respect to the tournament period.  The brief summary of the invention states:

> One or more *sequences of tournament games are preprogrammed* from the plurality of tournament games, and a *tournament period is programmed* for each tournament game.  The *preprogrammed tournament game* for each sequence is playable during the *programmed tournament period* for the respective sequence.  A plurality of sequences of tournament games may be preprogrammed to run simultaneously.

*'887 patent* at 2:6-13 (emphasis added). The language of claim 1 makes the same distinction.  Claim 1(b) discloses a "means for preprogramming at least one sequence of tournament games from the plurality of tournament games."  Claim 1(c) states "means for programming a tournament period for each tournament game, the preprogrammed tournament game for each sequence being playable during the programmed tournament period for the respective sequence." The specification and claim language clearly distinguish between "preprogramming" sequences of tournament games and "programming" tournament periods, indicating that tournament game sequences are programmed earlier than tournament periods.

JVL suggests that the duration for each tournament game is set before the sequence is played.  It does not contend that the tournament period is set or programmed before the sequence of tournament games is programmed.  Sequences of tournament games can be preprogrammed and the tournament period for each tournament game can be programmed subsequently without undermining the fact that the programming of the

tournament period occurs in the setup mode before the video game machine is placed in game play mode and made available for users to play tournaments.  Consequently, Merit's arguments do not undermine JVL's "before the sequence begins" construction. Nonetheless, this language is redundant as the patent teaches that the setup functions occur before a player can play any games.  *'887 patent* at 3:38-39 ("Next, the setup mode is exited and the video game machine becomes ready for game play.") JVL's construction is not adopted in its entirety.

"Tournament period for each tournament game" is construed as "*a period of time, set during the setup mode, during which each tournament game in a sequence can be played*."

> ### *"a game playable in the non-tournament mode"*

The next term that requires construction appears in dependent claim 4:

(4)     A system according to claim 1 further comprising a non-tournament mode, at least some of the plurality of tournament **games** being **playable in the non-tournament mode**.

Claim 4 describes a non-tournament mode.  JVL's proposed construction of a "game playable in the non-tournament mode" is "a standard game which, unlike a tournament game, is not extended." *Def.'s* '887 *Presentation* at 26.  Merit construes the last phrase of this claim as "[a]t least some of the more than one tournament game are playable in the non-tournament mode."  *Pl.'s '887 Presentation*, Ex. 3 at 9.

JVL points out that the patent distinguishes between games played in and out of the tournament mode: "each of the video games may be played in either a *regular, non-tournament mode*, or in a *tournament mode*." *'887 patent* at 4:50-51.  (emphasis added)

On the other hand, Merit points out that the claim language itself allows for tournament games to be played in a non-tournament mode.  *'887 patent*, claim 4.

JVL's construction introduces unnecessary confusion into the claim interpretation process.  The plain and ordinary meaning of "game playable in the non-tournament mode" is clear and no construction is required.

"*only a single tournament game is playable for each sequence*"

Dependent claim 5 contains the next disputed phrase:

(5)     A system according to claim **1** wherein **only a single tournament game is playable for each sequence** within the at least one sequence of tournament games.

JVL argues that "only a single tournament game is playable for each sequence" means "each sequence of tournament games consists of two or more repetitions of the same tournament game."  *Def.'s* '887 *Presentation* at 30. This interpretation builds upon JVL's construction of "sequence of tournament games" offered with respect to claim 1(b).  JVL's construction was not fully adopted.  Rather, as discussed above, "sequence of tournament games" means "*one or more type(s) of tournament game(s) played at least times in succession.*"

Merit's proffered construction is "only a single tournament game is playable in a sequence of tournament games." It argues that construing "only a single game" to mean "two or more repetitions of the same tournament game," as JVL does, is "plainly wrong" and has "no basis" in the patent.  However, JVL has not simply equated a "single" game with "two or more."  Its argument here is consistent with its argument with respect to claim 1, namely, that a sequence of tournament games, as claimed in claim 1(b), must include at least two games.

There is a difference between playing a single type of game, such as Solitaire, one time, and playing Solitaire more than once.  JVL's construction captures this distinction.  Referring back to claim 1, claim 5 states that each sequence includes the play of only a single tournament game.  JVL points out that while claim 1 does not say what tournament games are included in the sequence, claim 5 specifically requires that the same tournament game is repeated in sequence.  Claim 5 provides a further limitation on claim 1, by requiring that the sequence be made up of only one type of game.  It does not indicate that a sequence consists of one play of a single type of game.  Accordingly, JVL's construction, "*each sequence of tournament games consists of two or more repetitions of the same tournament game*," is adopted.

### Means-Plus-Function Claims 1(b), 1(c) and 3(d)

Patent claims can be recited as a means for performing a certain function without reciting the structure used to perform the function.  35 U.S.C. § 112, ¶ 6.  JVL argues that means-plus-function claims 1(b), 1(c) and 3(d) cannot be construed.  Construction of a means-plus-function claim proceeds in two steps.  First, the claimed function must be identified.  Then, the structure disclosed in the specification that performs the disclosed function must be determined. *Micro Chemical, Inc.*, 194 F.3d at 1257-58.  If no corresponding structure can be identified, the claim is invalid for indefiniteness. *Budde v. Harley-Davidson*, *Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001).

JVL does not contend that the functions listed in claims 1 and 3, namely, "means for preprogramming at least one sequence" and "means for programming a tournament period," are not amenable to construction.  Rather, it argues the patent does not clearly disclose a means for performing these functions.

The functions claimed in the three means-plus-function limitations at issue are not in dispute.  The function claimed in claim 1(b) is "preprogramming at least one sequence of tournament games from the plurality of tournament games."  Claim 1(c)'s function is stated as "programming a tournament period for each tournament game."  The recited function of claim 3(d) is "preprogramming the at least one sequence to either continuously repeat or to end after the last tournament in the sequence is completed."

Merit and JVL disagree as to whether the '887 patent discloses an appropriate structure for carrying out these functions.  Merit insists the processor 14 described in the specification's "Detailed Description of the Automated System" is the structure that performs all three functions. The processor 14 is shown in Figure 1, a "schematic block diagram of a preferred embodiment of the present invention." *'887 patent* at 2:27-29.  JVL argues the identified "processor" is insufficient because the specification does not show a structure and the processor is not clearly identified with the claimed function.

Whether the specification adequately sets forth the structure for performing the claimed function requires looking at the disclosure from the vantage of one skilled in the art. 35 U.S.C. § 112.  The specification must "clearly associate" the structure with the performance of the function.  *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* 296 F.3d 1106, 1113 (Fed. Cir. 2002).  Here, it does.

JVL argues that there is no "clear association" linking the claimed functions with the disclosed processor.  Nowhere in the specification does it explicitly state that the processor on which Merit relies performs each of the claimed functions.  However, other functions are attributed to the processor.  For example, "[a]fter a player completes a round of game play, the processor 14 outputs a total player score." *'887 patent* at 5:16-17.

31

To overcome the statutory presumption of validity, one challenging a means-plus-function claim for lack of a structure must prove, by clear and convincing evidence, that the specification does not disclose a structure sufficient to be understood by one skilled in the art as enough to perform the function claimed.  *Budde*, 250 F.3d at 1376.  JVL has failed to meet this burden.  The "Detailed Description of Automated Tournament System" is, as Merit argues, linked to the automated tournament system.  The processor 14 and some of its functions are described in this section.   While the specification language does not provide a "clear association" with the processor and the claimed functions, the various drawings included in the specification do.  The drawings, which relate back to the preferred embodiment in Figure 1, include depictions of the functions claimed in claims 1(b), 1(c) and 3(d).  Figure 1 clearly shows the processor 14.  The specification discloses a processor for carrying out the claimed functions.  JVL has failed to show that claims 1(b), 1(c) and 3(d) cannot be construed.

### The '799 Patent

U.S. Patent No. 5,743,799 relates generally "a method for setting game credits in a video game machine and tallying a total currency amount fed into the machine."  U.S. Patent No. 5,743,799 (filed June 3, 1996) at 1:13-15 ("*'799 patent*").   Among other things, the present invention allows the machine operator flexibility in setting the number of game credits a player receives for varying currency amounts paid into the machine.

### Claim 1

JVL puts the following terms found in claim 1 in dispute: "coin type," "showing .. the total number of currency units associated with each coin type," and "selecting the total number of currency units to be associated with each coin type":

(1)     A method for tallying a total currency amount fed into a gaming machine which accepts a plurality of different types of coins, each coin representing a different number of currency units, the method comprising the steps of:

    (a)    displaying a setup screen on a video display **showing** a representation of the plurality of different **coin types** and **the total number of currency units associated with each coin type**;

    (b)    **selecting the total number of currency units to be associated with each coin type** while displaying the setup screen, wherein the selection is made individually for each **coin type**, a **coin type**/currency unit ratio being established for each different type of coin; and

    (c)    tallying the total currency amount fed into the machine based upon the number of coins deposited in the gaming machine and the total number of currency units selected for each **coin type**.

The interpretations of these terms rely on Figure 3 of the '799 patent":



FIG. 3

"*coin type*"

"Coin type" is used throughout claim 1 and the rest of the '799 patent.  JVL argues that this term should be construed to mean that "coin types cannot be changed by the operator."  Merit proposes a simpler construction, "type of coin."

Although the substance of JVL's construction is not inaccurate, it is unnecessary. In the description of the preferred embodiment found in Figure 3, which shows a designation for coin type, the patent states that the coin input is "set at the factory and cannot be changed by the game operator." *'799 patent*, at 5:38-40.  In this context, this language indicates that the game operator cannot adjust the coin input column; but, it does not provide a basis for reading this limitation into the term "coin type" as used throughout the patent.

The meaning of "coin type" is clear from the surrounding claim language.  It means, as Merit suggests, "type of coin" which is synonymous with "coin type."  Therefore, the term requires no construction.

### "*showing ... the total number of currency units associated with each coin type*"

JVL's construction of "showing ... the total number of currency units associated with each coin type" is "showing a specific number of meter pulses to be associated with each of the distinct symbols on the setup screen representing the different coin types." *JVL's Markman Hrg. Presentation, '799 patent* at 12 ("*Def.'s '799 Presentation*").  On the other hand, Merit construes this claim as "showing the total number of cents associated with each coin type."  *Merit's Markman Hrg. Presentation*, *'799 patent*, Ex. 3 at 3 ("*Pl.'s '799 Presentation*").  The inquiry focuses on whether the "the total number of currency units" is a "specific number of meter pulses" as JVL contends or "cents" as posited by Merit.

As JVL explains, the "meter pulses" column of Figure 3 indicates that a certain number of "meter pulses' are associated with each coin input.  In describing the preferred embodiment of Figure 3, the patent states "the meter pulse is equal to the number of currency units deposited in the game device (i.e. the total currency amount deposited in the

game device)" *'799 patent* at 6:35-37.   JVL emphasizes that the patent uses the generic

term "currency units" and not a particular form of currency such as "cents" or "pesos."

Furthermore, Figure 4 of the patent depicts, among other things, a currency input device

110 that sends a signal to the computer 102 which then sends "pulses" to a tally meter 120.

Both parties place unjustified limitation on the meaning of the term "currency units."

In fact, Merit concedes that the machine is not limited to being programmed for United

States cents, and can, as JVL argues, be set up to receive pesos or other forms of

currency.   *Tr.* at 173. It offers no basis in the patent for its use of the term "cents" and

admits that the term "currency units" might not require construction. *Id.* ("... the machine

can be set up for pesos, pounds or anything else.  Maybe we should have left it as currency

units.") Similarly, JVL relies on Figure 3 and its description to argue that "currency units"

and "meter pulses" are interchangeable, without explaining why we should not also

associate "coin type" with "credits" which are listed in the third column of Figure 3 and can

also be adjusted for each individual coin type.   *'799 patent* at 6:3-14.

"Currency units" are neither "cents" nor "meter pulses" exclusively.  Neither of the

proffered constructions is adopted.  Indeed, the term "showing ... the total number of

currency units associated with each coin type" as used in the '799 patent, says it all and

does not require construction.

"*selecting the total number of currency units to be associated with each coin*
*type*"

JVL's interpretation of "selecting the total number of currency units to be associated

with each coin type," a term found in element (b) of claim 1, is "an operator individually sets

the specific number of meter pulses that are directly associated with each of the distinct

symbols representing the different coin types."  Merit's construction is "choosing the total

number of cents to be associated with each coin type." *Def.'s '799 Presentation* at 16.  As discussed above, a "currency unit" is neither a "meter pulse" nor a "cent." Therefore, these aspects of the proposed interpretations are not adopted.

Merit and JVL construe the word "selecting" differently.  Merit essentially interprets "selecting" as "choosing."  JVL is correct in arguing that the '799 patent allows the game operator to set the number of meter pulses associated with each coin type. *'799 patent* at 2:16-20 ("The present invention . . . [provides] an apparatus and method which allows the game operator to program the meter to advance in accordance with the exact value of the entered currency and to allow such ratios to be individually adjusted.")  However, this alone is insufficient reason to read the game operator's role into the claim language.  Indeed, the plain and ordinary meaning is clear.  Thus, the term "selecting the total number of currency units to be associated with each coin type" does not require additional interpretation.

## Claim 3

The terms that require construction, "showing . . . the number of game credits associated with each coin type" and "selecting the number of game credits to be associated with each coin type," appear in the first two elements of Claim 3:

(3)      A method for setting game credits and tallying a total currency amount fed into a gaming machine which accepts a plurality of different types of coins, each coin type representing a different number of currency units; the method comprising the steps of:

(a)      displaying a setup screen on a video display **showing** a representation of the plurality of different coin types, **the number of game credits associated with each coin type** and the total number of currency units associated with each coin type;

(b)      **selecting the number of game credits to be associated with each coin type** while displaying the setup screen, wherein the selection is made individually for each coin type, a coin type/game credit ratio being established for each of the different coin types;

"*showing ... the number of game credits associated with each coin type*"

JVL's proffered construction of "showing ... the number of game credits associated with each coin type" is "showing a specific number of game credits associated with each of the distinct symbols representing the different coin types." *Def.'s '799 Presentation* at 28.  Merit does not offer a specific construction for this term except to substitute "type of coin" for "coin type."  *Pl.'s '799 Presentation*, Ex. 3 at 8.

As JVL argues, the '799 patent indicates that a certain number of game credits is "granted for each input of the selected number of coins." '*799 patent* at 6:3-5.  Yet, JVL provides no explanation of how its construction brings us any closer to the plain and ordinary meaning of this term.  Indeed, it does not.  Merit's suggestion is merely rearranging words and does nothing to construe words having a plain and ordinary meaning. Therefore, the term does not require construction.

"*selecting the number of game credits to be associated with each coin type*"

JVL argues that "selecting the number of game credits to be associated with each coin type" means "that an operator individually sets the specific number of game credits that are directly associated with each of the distinct symbols representing the different coin types."  Merit's only change is to substitute "choosing" for "selecting" and "type of coin" for "coin type."

For the same reasons discussed above, the substitution of "choosing" for "selecting" is unnecessary and "type of coin" for "coin type" is unnecessary.  Accordingly, they are not adopted.

The specification teaches that different numbers of game credits may be selected for each of the coin inputs.  '*799 patent* at 6:24-25.  The fact that this occurs does not

justify JVL's expanded construction.   Once again, JVL's proposed construction unnecessarily adds to the plain and ordinary meaning of the claim term.  Thus, this term does not require construction.

**Claim 7**

Two disputed terms, "showing ... a number of game credits associated with a deposit of one coin of a particular type" and "selecting the number of game credits to be associated with a deposit of one coin for each of the different coin types" appear in the method claim 7:

> (7)    A method for adjusting the coin/credit ratio in a gaming machine which accepts a plurality of different types of coins, the method comprising the steps of:
>
> > (a)    displaying a setup screen on a video display **showing** a representation of the plurality of different coin types and **a number of game credits associated with a deposit of one coin of a particular type**; and
> >
> > (b)    **selecting the number of game credits to be associated with a deposit of one coin for each of the different coin types** while displaying the setup screen, wherein the selection is made individually for each coin type, a coin type/game credit ratio being established for each of the different coin types.

"*showing ... a number of game credits associated with a deposit of one coin of a particular type*"

JVL's construction of "showing ... a number of game credits associated with a deposit of one coin of a particular type" is "showing a specific number of game credits associated with a deposit of one coin of a particular type." *Def.'s '799 Presentation* at 35. Merit's construction simply substitutes the word "insertion" for "deposit." *Pl.'s '799 Presentation*, Ex. 3 at 13.  Thus, the only two issues are whether to adopt JVL's insertion of the word "specific" and Merit's inclusion of "insertion" into the claim construction.

The plain and ordinary meaning of this term is best expressed in the language of the claim itself.  The proffered constructions do not add value to the understanding.  The specification does not require that "specific" be included in the construction. Nor is it necessary to construe "deposit' to mean "insertion."  The only support that Merit offers for this construction is in the specification's description of Figure 3, which states "[t]he ratio of coins *inserted* to game credits granted per coin can be individually adjusted for each coin type." *'799 patent* at 6:41-43 (emphasis added).  However, construing the claim term to include "inserted" is not necessary because the plain and ordinary meaning of "deposit" is clear.  Thus, no construction is required.

"*selecting the number of game credits to be associated with a deposit of one coin for each of the different coin types*"

According to JVL, "selecting the number of game credits to be associated with a deposit of one coin for each of the different coin types" means "that an operator individually sets the specific number of game credits that are directly associated with the deposit of one coin of each coin type."  *Def.'s '799 Presentation* at 38.  Merit construes this term as "choosing the number of game credits associated with the insertion of one coin for each of the types of coins."  *Pl.'s '799 Presentation*, Ex. 3 at 13.

JVL correctly notes that the language of element (a), involving the "deposit of one coin of a particular coin type" is distinct from element (b), which describes "a deposit of one coin for each of the different coin types." *'799 patent* at 9:4-7.  As depicted in Figure 3 and described in element (b) of claim 7, the operator can adjust the number of credits applicable to a particular type of coin such that a player might receive one game credit if he deposits a nickel and six game credits for depositing a quarter.  *'799 patent*, Fig 3. However, this does not justify JVL's inclusion of the operator's role or the words "specific"

or "directly."  Nor is such construction necessary to achieve the plain and ordinary meaning

as understood by a person skilled in the art.  As with other disputed terms in this patent,

"selecting the number of game credits to be associated with a deposit of one coin for each

of the different coin types" does not require construction.

## Conclusion

Pursuant to this memorandum opinion, the claims shall be construed as stated in

the following Order.